IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:24-CV-29-RJ

KENNETH H. ROGERS,

Plaintiff/Claimant,

v.

ORDER

FRANK BISIGNANO,
*Commissioner of Social Security*,

Defendant.

This matter is before the court on the parties' briefs filed pursuant to the Supplemental Rules for Social Security Actions. [DE-8, -11]. Claimant Kenneth Rogers ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of his application for a period of disability and Disability Insurance Benefits ("DIB"). Claimant filed a reply brief, [DE-12], the time for filing further responsive briefing has expired, and the matter is ripe for adjudication. Having carefully reviewed the administrative record and the briefs submitted by the parties, the final decision of the Commissioner is affirmed.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on June 9, 2019, alleging disability beginning December 21, 2018. (R. 32, 297–303). His claim was denied initially and upon reconsideration. (R. 109–54). A telephonic hearing before an Administrative Law Judge ("ALJ") was held on February 1, 2023, at which Claimant, represented by counsel, and a vocational expert ("VE") appeared and testified. (R. 56–92). At the administrative hearing, Claimant explained that he attempted to return to work after December 2018 and effectively

amended his alleged disability onset date to June 2021.[1] (R. 64, 72) On February 28, 2023, the ALJ issued a decision denying Claimant's request for benefits. (R. 29–55). On July 26, 2023, the Appeals Council denied Claimant's request for review. (R. 10–15). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is

---

[1] As Claimant mentions in his brief, at the hearing the ALJ "never fully confirmed with Plaintiff that he wished to amend his alleged onset date," and Claimant's counsel noted that he "really wish[ed] the Court could go all the way back to his Title II filing date." Pl.'s Br. [DE-8] at 9. However, Claimant does not now argue that the original disability onset date should not have been changed, and accordingly, the issue is waived. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to 'develop [its] argument'—even if [its] brief takes a passing shot at the issue.").

2

limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

### III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520, under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

3

## IV. ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful employment since June 1, 2021. (R. 35). Next, the ALJ determined Claimant had the severe impairments of degenerative disc disease, cervical radiculopathy, cervical foraminal stenosis, degenerative changes of the right acromioclavicular joint, right shoulder rotator cuff tear, biceps tendinosis, carpal tunnel syndrome of the right hand, left ankle revision/repair procedure, obesity, asthma, anxiety, depression, and borderline intellectual functioning, and the non-severe impairments of hypertension, allergic rhinitis, and gastroesophageal reflux disease. *Id.* At step three, the ALJ concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 35–41). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in moderate limitations in understanding, remembering, or applying information; adapting or managing oneself; and concentrating, persisting, or maintaining pace; and mild limitations in interacting with others. (R. 39–41). Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding that from June 1, 2021 to July 10, 2022, he had the ability to perform medium work[2] with the following restrictions:

> he could occasionally reach overhead; occasionally be exposed to fumes, odors, dusts, gases, poor ventilation, or other pulmonary irritants; could understand, remember, or carry out simple instructions; could sustain concentration, persistence, or pace in two-hour increments; and required a work environment with no production pace or quotas.

---

[2] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, they can also do sedentary and light work. 20 C.F.R. § 404.1567(c).

4

(R. 41–46). The ALJ also found that, from July 11, 2022 through the date of the decision, Claimant had the ability to perform light work[3] with the following restrictions:

> he could occasionally reach overhead; frequently climb ladders, ropes, and scaffolds; walk or stand in only 30-minute increments before having to sit; occasionally be exposed to fumes, odors, dusts, gases, poor ventilation, or other pulmonary irritants; understand, remember, or carry out simple instructions; sustain concentration, persistence, or pace in two-hour increments; and required a work environment with no production pace or quotas.

(R. 47–48). In making these assessments, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. 42). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work as an automobile mechanic and small engine mechanic. (R. 48). Nevertheless, at step five, upon considering Claimant's age, education, work experience, and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that he can perform. (R. 48–50).

## V. DISCUSSION

Claimant argues that the ALJ erred by failing to properly explain why his subjective complaints were deemed inconsistent with the evidence of record, and the evaluation of the evidence does not provide a clear path to her reasoning. Pl.'s Br. [DE-8] at 12–17. The Commissioner contends that substantial evidence supports the ALJ's evaluation of Claimant's subjective statements regarding his physical impairments, as well as both RFC assessments. Def.'s Br. [DE-11] at 7–16.

---

[3] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

At the February 1, 2023 administrative hearing, Claimant testified that he could not pick up a ten-pound dumbbell from a shelf directly in front of him without dropping it. (R. 74). When asked if this was due to a lack of grip strength, Claimant explained that his shoulder injury was never completely repaired, and his "grip from the carpal tunnel is not where it was right before the carpal tunnel and the radius arm release in [his] arm." *Id.* Claimant also reported that he cannot reach over his head, and as a result, his wife often has to wash his hair for him; he has nerve pain spanning from his left arm to his fingers and his doctor believes "six and seven discs are also going to need to be fused"; because of the pain and tingling sensation in his left arm, he "can't even reach out and pick up a pillow to move it from where it got placed while [he] was sleeping"; the pain and tingling in his shoulders, arms, and fingers is present all the time; and he cannot turn his head or look up or down without experiencing "excruciating pain shooting down" his arm. (R. 74–76). When asked about impairments impacting his lower body, Claimant testified that he has issues with walking further than to the end of his driveway and back without stopping (and on some days, he cannot even do that), as his lower back pain causes him to feel like "somebody's sticking a hot skewer in the lower part of [his] spine and just turning the heat up to 1,000 degrees"; his lower back pain radiates down his right leg; and "now that [he has] tore up [his] left ankle, the total limp from that is bringing more pain [ ] to [his] . . . lower back." (R. 76).

The ALJ considered Claimant's testimony concerning his physical limitations at length, specifically by noting the following:

> The claimant amended the alleged date of disability onset to June 1, 2021, explaining that he had gone back to work from September 2020 until June 1, 2021, during which time, according to his employer, he was given significant accommodations while attempting to work. By June 1, 2021, despite the efforts of his employer through friendship and the employer's flexibility and support, the claimant left work as he was unable to maintain the job effort.

6

> The claimant further testified that he is unable to pick up 10 pounds due to the
> effects of a shoulder injury not completely repaired and loss of grip strength. He
> said that he cannot reach out to pick up a pillow and movie it. He said the pain
> and tingling in the finger is always present. He said that needs cervical surgery at
> C6-C7. He said that he cannot reach overheard and that his wife washes his hair
> for him. He said he has nerve pain down the left arm to the fingers. Looking up
> also causes neck pain to shoot down his arm.
>
> The claimant further testified that he is depressed and becomes distracted. It is
> like he has daemons [sic] in his head and he fights them. He said he can walk to
> the end of the driveway and back, but some days cannot manage even that.

(R. 42). After doing so, the ALJ concluded that while Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely consistent with the medical evidence and other evidence in the record. *Id.* Claimant now generally argues that the ALJ erred in discrediting his subjective complaints by failing to discuss how Claimant's current reports of pain and limitations resulting from pain are not supported by the record, or how Claimant's reports of pain would allow him to perform the requirements of light work.[4] Pl.'s Br. [DE-8] at 12–17.

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. § 404.1545(a)(1). "[T]he residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p). The ALJ must provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (quoting SSR 96-8p); *see also Clifford v. Apfel*, 227 F.3d

---

[4] Claimant does not raise any arguments related to the first RFC, which restricted Claimant to a limited range of medium work.

7

863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

Federal regulation 20 C.F.R. § 404.1529(a) provides the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593–94. First, the ALJ must objectively determine whether the claimant has medically documented impairments that could cause his or her alleged symptoms. S.S.R. 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016); *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes that determination, he must then evaluate "the intensity and persistence of the claimant's pain[,] and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595, and whether the claimant's statements are supported by the objective medical record. S.S.R. 16-3p, 2016 WL 1119029, at *4; *Hines*, 453 F.3d at 564–65.

Objective medical evidence may not capture the full extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors concerning the "intensity, persistence and limiting effects" of the claimant's symptoms. S.S.R. 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 404.1529(c)(3) (showing a complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence, *Craig*, 76 F.3d at 595–96, but neither is the ALJ required to accept the claimant's statements at face value; rather, the ALJ must "evaluate whether the statements are consistent with objective medical evidence and the other evidence." S.S.R. 16-3p, 2016 WL 1119029, at *6; *see Ladda v. Berryhill*, 749 F. App'x 166, 171 (4th Cir. 2018) ("The ALJ cannot 'reject a claimant's statements about the intensity and persistence of . . . pain or other symptoms' or about the effect of those symptoms on a claimant's

8

ability to work 'solely because the available objective medical evidence does not substantiate them.'") (quoting 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2)); *Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at \*4–8 (E.D.N.C. Mar. 23, 2011), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

In the instant case, while Claimant's arguments focus on the physical limitations included in the ALJ's second RFC assessment, to fully understand that assessment, it must be viewed in tandem with the first.[5] To craft the first RFC, which corresponds to the thirteen-month period immediately following Claimant's year-long attempt to return to work, the ALJ began by summarizing the medical evidence in the record. Notably, the objective medical evidence available for the years prior to the amended onset date is extensive. As relevant here, before June 1, 2021, Claimant, who has long worked on heavy machinery, already had a history of lower back pain and of cervical spine impairment, which ultimately required a cervical discectomy with interbody fusion in June of 2019. (R. 42–43, 450–52, 466–74, 479–80, 568–69, 577–78, 587–88, 595, 603–04, 611–12, 619, 626, 632, 640, 647–48, 655, 663–65, 685–97, 706–14, 717–18). Following the cervical discectomy, a myelogram revealed continuous nerve impingement at C3–C4 and Claimant still complained of neck pain, as well as shooting right arm pain towards his elbow and pain on his left side that radiated to the spine. (R. 549–50, 559–60, 663–65, 682–83, 701–05). Consequently, he was approved for a second cervical spine surgery in August of 2019. (R. 549). That procedure was performed in September 2019, (R. 679–81), and in subsequent months, Claimant's neck pain appeared to improve overall. *See* (R. 676) (doctor's note from October 2019 stating that Claimant "had a C3-4 anterior cervical diskectomy and fusion done 3 weeks ago. Feels like he is better, but now has slight shoulder pain."); (R. 674)

---

[5] As will be further explained below, the ALJ assessed a second RFC primarily to accommodate left ankle impairments detailed by Claimant's physical therapist in a December 2022 email.

9

(doctor's note from October 2019 reflecting that Claimant "has had two previous neck surgeries since I last saw him . . . . This has helped quite a bit . . . . I think the cervical fusions have taken care of the neck problem."); (R. 672) (noting that "his neck is doing well" in November 2019); (R. 670) (noting that "his neck is doing relatively well" in December 2019).

Claimant also had a history of shoulder problems prior to the amended onset date, which occurred partly in tandem with his lumbar and cervical spine issues and ultimately resulted in a right rotator cuff repair for a 2.5-centimeter tear, subacromial decompression, and extensive joint debridement procedure in January 2020. (R. 532–33, 540–41, 668–69, 671–72, 674, 676–77, 685–96, 710–16). A month after the surgery, Claimant still reported a "significant amount of pain" and had decreased sensation in the ring and small fingers. (R. 666–67). However, he was able to fully move his right elbow and flex and extend his fingers. *Id.*

On March 13, 2020, Claimant begin physical therapy to address the pain in his right shoulder post-surgery, and these visits were authorized by his former employer's worker's compensation program. (R.729–819). Claimant attended physical therapy regularly and experienced some benefit until late May of 2020, where he reported his right shoulder and rhomboid pain was a five out of ten; exhibited limited and painful right cervical rotation with compensation into sidebend when rotating right; exhibited an unremarkable elbow manual muscle test; and had a large spasm with an active trigger point in his right rhomboids and positive jump sign on palpitation. (R. 731–32, 738–43). At the May 2020 visit, Claimant's physical therapist noted that he was making "some progress" in therapy, "with progression of strength and a recent increase in function"; he was "progressing with scapular stabilization exercises but limited due to pain"; his active range of motion "continue[d] to be limited for overhead and behind back movements"; his pain was "localized to subacromial space"; his

"rehab potential is good"; his "discharge prognosis is good"; and "his tolerance to treatment is good." *Id.* However, when the physical therapist offered to schedule more visits, Claimant declined, stating that he wanted to "wait until he sees the doctor . . . and if he is returning to work." *Id.* Claimant was discharged from physical therapy a few days later, and his medical records indicate that he was discharged because he "got a letter saying he will be fired unless he returns to work full duty next week" and was "released by physician from Physical Therapy and informed he was cleared for full duty." (R. 732); *see* (R. 744) (letter from physician reflecting return to full duty on June 8, 2020).

While Claimant was receiving physical therapy for his shoulder pain, he was also attending regular medical appointments with the orthopedists who performed his cervical fusions and rotator cuff surgery. (R. 828–40). With each follow-up visit, Claimant's pain levels associated with these issues improved. *See id.* Dr. Manke, the doctor who performed Claimant's rotator cuff repair, noted good elbow, wrist, and hand range of motion six weeks post-surgery, with positive Tinel sign over his ulnar nerve at his elbow and positive scratch collapse test over his ulnar nerve at his elbow, but 4/5 intrinsic strength and the ability to make a fist and fully extend the digits; active forward flexion to 140 degrees 3 months post-surgery, with external rotation to 40 degrees and excellent overall strength without significant increase in pain with testing; and active forward flexion to 160 degrees, external rotation to 60 with good strength and minimal pain 4 months post-surgery. (R. 830, 834–39). On April 23, 2020, Dr. Manke cleared Claimant for modified duty and stated that he would "see him back in 6 weeks and hopefully get him back to near full duty." (R. 835, 853). Then, at Claimant's next appointment on June 4, 2020, just days before he was discharged from physical therapy, Dr. Manke made the following treatment note: Claimant "states he is doing great. He is ready to go back to duty." (R. 830).

11

Similarly, after Claimant met with Dr. Clifford, the surgeon who performed his cervical fusions, on May 13, 2020 for a final follow-up visit, Dr. Clifford noted that Claimant "feels better" and is cleared for regular duty because he is "MMI [maximum medical improvement] at this point." (R. 832, 846).

Finally, the medical records indicate that Claimant had issues with his right hand's functionality pre-dating the amended onset date, and these problems stemmed from recurrent carpal tunnel syndrome, right pronator teres syndrome, and cubital tunnel syndrome. (R. 697–700, 719–20, 828–29). Claimant underwent a right endoscopic carpal tunnel release and open pronator teres release in January 2018. (R. 719–20). Claimant was also diagnosed with right cubital tunnel syndrome shortly after his shoulder surgeries and was scheduled for an ulnar nerve decompression for some time in spring 2020. (R. 829–30, 834, 836). However, it is unclear from the medical records whether this procedure actually took place.

Notably, the medical evidence following Claimant's June 2020 return to work is extremely limited. On December 3, 2021, Claimant met with a pulmonologist, complaining of worsening asthma symptoms but reporting no joint swelling, no limited motion, and no muscle aches. (R. 866–69). Then, on January 1, 2022, after taking prescribed medications and completing an allergen testing panel, Claimant followed up with the pulmonologist and it was noted that his asthma symptoms, while still significant, were improving, and that he continued to report no joint swelling, no limited motion, and no muscle aches. (R. 861–65). The final "record" from the relevant time period is an email dated December 12, 2022 from Andrew B. Coulter, purportedly Claimant's physical therapist, which states that Claimant has been working with him after receiving two ankle surgeries, the most recent of which was July 11, 2022; Claimant "demonstrates significant limitations regarding pain and dorsiflexion range of motion in the left

12

ankle, which leads to difficulty in walking and general dynamic weight bearing activity"; Claimant "has not been able to resume employment as a mechanic since his first ankle injury (and eventual surgery) in mid-2021"; and "[i]t seems unlikely that at this point [Claimant] will regain the function and comfort in the left ankle to be able to go back to any employment that requires high intensity or extended duration of weight bearing tasks." (R. 876).

After summarizing the available medical evidence and noting the paucity of documentation following Claimant's return to work in June of 2020, the ALJ assessed two RFCs for Claimant based on the date of his last ankle surgery—the existence of which was solely documented in the email from Mr. Coulter. *Id.* In assessing the first RFC, the ALJ balanced the available medical records, including the records from Claimant's physical therapist and orthopedists immediately post-dating his rotator cuff repair, against Claimant's hearing testimony; the opinions rendered by the state agency physicians who evaluated Claimant's medical records at the initial level and upon reconsideration; third-party statements from Claimant's wife, friend, neighbor, and prior work supervisor; and the decision awarding Claimant worker's compensation in 2019 related to his right shoulder injury. (R. 41–46). The ALJ deemed the state agency physicians' opinions persuasive, finding that the record evidence through July 11, 2022 did not support a significant limitation in Claimant's ability to stand/walk but did support a finding that Claimant's upper extremity restrictions would limit his ability to lift and carry to the 25–50 pound range and his ability to lift overhead. (R. 45). The ALJ explained that these limitations, which were ultimately incorporated into the first RFC, comported with the third-party statements and underlying evidence upon which Claimant's earlier worker's compensation claim was based. (R. 46). Accordingly, the first RFC reflects that Claimant was capable of performing medium work during the relevant period but also limited

13

him to only occasional overhead reaching. (R. 41–46).

In assessing Claimant's second RFC, once again the ALJ weighed the available evidence, including the evidence considered in preparing the first RFC, against the email sent from Mr. Coulter, Claimant's physical therapist. (R. 47–48). The ALJ explained that Mr. Coulter's statements regarding Claimant's significantly limited dorsiflexion in the left ankle secondary to pain, difficulty walking, and limited weight-bearing capability following his ankle surgery on July 11, 2022 were persuasive and consistent with the clinical record. (R. 47). However, the ALJ determined that Mr. Coulter's statement concerning Claimant's ability to resume work as a mechanic addresses a matter specifically reserved for the Commissioner under 20 § C.F.R. 404.1520b(c) and, as such, found it neither inherently valuable nor persuasive. *Id.* Similarly, the ALJ noted that while Mr. Coulter's statement concerning the likelihood of Claimant regaining function and comfort in his left ankle sufficient to return to any employment that requires high intensity or an extended duration of weight-bearing tasks was "persuasive in that it addressed the claimant's limited weight-bearing ability, the balance of the comment addresses an issue reserved to the Commissioner." (R. 47–48). Accordingly, the second RFC reflects that Claimant has been capable of performing light work since July 11, 2022, but also limits him to walking or standing in 30-minute increments before having to sit. *Id.*

Claimant's first objection to the ALJ's treatment of his subjective complaints centers on her consideration of the physical therapy notes from the first half of 2020, which immediately post-dated Claimant's rotator cuff repair. Pl.'s Br. [DE-8] at 14–15. Specifically, Claimant contends that the medical records indicate that he was not discharged from treatment because he was physically ready and no longer experiencing pain in his right hand and arm, but because he was forced back to work prematurely, as he testified at the administrative hearing. *Id.*

14

Claimant's argument, which ultimately advances the position that further upper extremity restrictions are warranted and incompatible with the second RFC, *see id.*, must fail. As the ALJ acknowledges in her decision, while the available physical therapy notes and medical records from early 2020 indicate that Claimant was still experiencing some degree of shoulder and arm pain in the months following his rotator cuff repair, there are also ample statements within the same treatment records showing that his overall pain levels and strength in these areas were improving and showing promising signs of recovery that warranted discharge in June. *See, e.g.*, (R. 43) (ALJ describes the physical therapy notes as documenting "steady progress in therapy and progression of strength with increase in function," though at his last visit "pain continued to limit his scapular stabilization exercises and active range of motion for overhead and behind back movements continued to be limited to about 50%"); (R. 731–32, 738–43) (treatment notes from final physical therapy visit reflecting that, while Claimant was still experiencing some shoulder pain and associated limitations, his "rehab potential is good" and "discharge prognosis is good"); (R. 835, 853) (treatment note from April 23, 2020 where, at a follow-up appointment related to Claimant's rotator cuff repair, Dr. Manke cleared Claimant for modified duty and stated that he would "see him back in 6 weeks and hopefully get him back to near full duty"); (R. 830) (treatment note from Claimant's next appointment on June 4, 2020, where he reported to Dr. Manke that he was "doing great. He is ready to go back to duty."). Moreover, the ALJ also considered—and deemed persuasive in all respects through July 11, 2022—the opinions rendered by the state agency physicians at both the initial and reconsideration levels, who evaluated Claimant's medical records in November 2019 and April 2020, respectively, and determined that Claimant could perform medium work and only an occasional bilateral overhead reaching limitation was appropriate for the upper extremity. (R. 45, 116, 131); *see* (R. 132)

15

(record from April 2020 stating "[Claimant] underwent right shoulder arthroscopy with rotator cuff repair for a 2.5 cm tear and subacromial decompression in 1/2020. By his 2/2020 f/u he could fully move the right elbow and could fully flex and extend his fingers. There were no signs of infection. Based on evidence in file, clmt is capable of RFC as prepared.").

Where contradictory evidence exists in the record, is acknowledged by the ALJ, and the court can trace the reasoning supporting her decision to favor one interpretation of the evidence over another, it is not the court's job to second-guess that choice. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) ("In reviewing for substantial evidence, [the court does] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ.") (citation omitted). Furthermore, by finding that Claimant was unable to perform his past relevant work and incorporating a reaching limitation into the first and second RFCs, the ALJ arguably did address Claimant's complaints of ongoing shoulder and arm pain. Thus, while the physical therapy notes from 2020 could be interpreted in a manner that is consistent with Claimant's testimony, the ALJ did not err by not assessing more stringent limitations because of them, and in fact the decision not to do so is supported by substantial evidence. *See Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 383 (4th Cir. 2021) ("Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. Though the threshold for such evidentiary sufficiency is not high, it requires that more than a mere scintilla of evidence support the ALJ's findings.") (internal quotation marks and citations omitted).

Claimant's second objection to the ALJ's evaluation of his subjective complaints is that she "never discuss[ed]" his report of carpal tunnel surgery or the continued problems he experiences with his right hand. Pl.'s Br. [DE-8] at 15. However, this argument also fails because

16

it is undermined by the record, albeit indirectly. First, the ALJ deemed Claimant's carpal tunnel syndrome of the right hand to be a severe impairment, despite the fact that the only carpal tunnel and open pronator teres release documented in the record occurred in January 2018, well prior to the amended onset date. (R. 35, 719–20). Second, the ALJ specifically stated in her decision that "[o]n one occasion, March 8, 2020, the claimant did show a positive Tinel's sign over the ulnar nerve at the elbow with a positive scratch collapse test over the nerve. However, he was able to make a fist and fully extend the digits of his hand though strength was somewhat reduced at 4/5." (R. 43). And third, in recounting Claimant's 2021 visits to the pulmonologist, the ALJ emphasized that Claimant's "review of systems was negative for all body systems. In particular, he specifically denied joint swelling, limited motion, muscle aches, numbness, weakness, tingling, burning, or shooting pains." *Id.*

Admittedly, the ALJ did not mention in her decision that Claimant was scheduled to undergo an ulnar nerve decompression sometime in spring 2020 for his right cubital tunnel syndrome. *See* (R. 829–30, 834, 836). This omission is not dispositive, though, because it is not clear from the record whether this procedure actually took place. Additionally, the ALJ did detail findings from the very appointment where it was noted that the procedure had been scheduled, and those findings reflect that even prior to the surgery Claimant was able to make a fist, fully extend the digits of his hand, and his intrinsic strength was 4/5. (R. 43, 836). In other words, while the ALJ did not cite the exact evidence that Claimant has highlighted, she cited evidence pertaining to Claimant's hand-related impairments that is sufficient to support her assessment of Claimant's subjective statements regarding his limitations. *See Dowling*, 986 F.3d at 383; *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) ("While the Commissioner's decision must contain a statement of the case, in understandable language, setting forth a discussion of the

17

evidence, . . . there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.") (internal quotation marks and citations omitted).

Claimant's third objection to the ALJ's handling of his subjective complaints pertains to the email dated December 12, 2022, which was sent from his physical therapist, Mr. Coulter. Pl.'s Br. [DE-8] at 15–16. Claimant asserts that the email is "highly consistent" with his administrative hearing testimony that he has trouble walking and standing, and this limitation is incongruent with the requirements of light work. *Id.* However, this argument is unsuccessful because the ALJ considered the email at length and actually found some of Mr. Coulter's statements to be persuasive and consistent with the clinical record. (R. 47). Specifically, the ALJ determined that the statement that Claimant has "significant limitations regarding pain and dorsiflexion range of motion in the left ankle, which leads to difficulty walking and limited dynamic weight-bearing capability" was persuasive, as was the statement that Claimant "seems unlikely at this point . . . to regain sufficient function and comfort in the left ankle to be able to go back to any employment that requires high intensity or an extended duration of weight bearing tasks." (R. 47–48, 876). Importantly, though, with respect to the latter statement, the ALJ clarified that it is persuasive in that it "addresses the claimant's limited weight-bearing ability." *Id.*

Despite Claimant's assertions to the contrary, Mr. Coulter's statements about Claimant's ankle impairment could arguably support a restriction to light work, as well as a more significant restriction, like Claimant would prefer. Critically, though, as explained above, it was ultimately the ALJ's responsibility to weigh Claimant's testimony about his own limitations against the available medical evidence, here Mr. Coulter's email, and determine its credibility. *See Hancock*, 667 F.3d at 472. Claimant may not agree with the result of that balancing test, but the record

18

indicates that the ALJ thoroughly considered the evidence related to Claimant's ankle impairment, particularly by crafting an entirely separate RFC because of Mr. Coulter's report and incorporating additional standing and walking limitations into that assessment. (R. 47–48). Thus, the undersigned, who can trace the ALJ's reasoning in this regard, will not reweigh the evidence as Claimant effectively requests, and to the extent that Claimant argues that the assessed 30-minute-increment standing/walking restriction provides no meaningful limitation to light work, Pl.'s Reply [DE-12] at 1–3, finds this irrelevant given that the ALJ's analysis is supported by substantial evidence.

Finally, Claimant's fourth objection to the ALJ's consideration of his subjective complaints concerns three of the third-party statements submitted on his behalf: a letter from his friend, Cory Arnold, dated January 11, 2023, (R. 416); a letter from his neighbor, Abbey Gialenes, dated January 13, 2023, (R. 417); and a letter from John Eader, his former work supervisor, dated January 18, 2023, (R. 418). Pl.'s Br. [DE-8] at 16–17. According to Claimant, these letters "significantly [support] Plaintiff's testimony he cannot perform light work, and the ALJ's recitation of evidence offers nothing to rebut his testimony." *Id.* To summarize, as relevant here, in Mr. Arnold's letter, he states that Claimant "is no longer able to perform many tasks he use[d] to be able to do, or now requires assistance to accomplish these tasks," including lifting items such as bags of groceries; gripping, pushing or pulling tools to perform home and vehicle maintenance; pushing or pulling open heavy doors to buildings or vehicles, particularly when the wind is blowing against the door; going up or down steps; stepping up, down or over curbs, thresholds to doors or into the tub/shower; traversing slopes; seeing behind or to the side due to a limited range of motion; lifting objects above his head; standing for prolonged periods; bending down, stooping or kneeling; using a ladder; performing personal hygiene due to the range of

19

motion involved and the associated pain; preparing meals due to the range of motion involved and the associated pain; and gripping utensils to prepare or consume meals. (R. 416). Ms. Gianeles, meanwhile, states that she has witnessed Claimant's health decline in the past two years she has known him, and particularly notes his gait and mobility issues; his need for assistance to pick up "even the smallest of items" from the garage floor, work bench, or table that is next to him; increased peripheral neuropathy; difficulty bending down to pick up items that have been dropped without losing balance or experiencing pain; and difficulty turning his neck in both directions without experiencing pain or dizziness. (R. 417). Lastly, Mr. Eader's letter describes Claimant's return to work in June 2020, where it "became quickly obvious that he was not 100% back to full health" and, as a result, his employer attempted to "scale back his workload and assign him more technical, diagnostic type repairs to ease the physical stress for him." (R. 418). According to Mr. Eader, such physical accommodations were not always possible as the employer "needed [Claimant's] talent and expertise in performing heavy equipment repairs," and Claimant's ability to perform at the same physical level never returned to what it once had been. *Id.*

Claimant's final argument cannot prevail for many of the same reasons articulated above. While the ALJ only briefly acknowledged the third-party reports and did not discuss them individually or in depth,[6] she did note that the evidence in the overall record does not support that Claimant is as limited in his daily activities as he contends. Claimant now argues that "the record significantly reports Plaintiff's testimony he cannot perform light work, and the ALJ's

---

[6] No argument was made relating to any failure to explicitly analyze the third-party statements. Regardless, this is not error where the statements at issue largely reiterate Claimant's testimony. *See Midkiff v. Berryhill*, No. 5:18-CV-57-BO, 2019 WL 1103392, at *3 (E.D.N.C. Mar. 8, 2019) ("[T]he ALJ did not err by declining to specifically discuss the cumulative third-party statements submitted by plaintiff's family members, which primarily reiterated the statements that plaintiff had made during her testimony.") (citing *Morgan v. Barnhart*, 142 F. App'x 716, 724–25 (4th Cir. 2005) (finding no error in ALJ's failure to address credibility of lay witness testimony that was duplicative of plaintiff's testimony)).

Case 2:24-cv-00029-RJ    Document 14    Filed 08/18/25    Page 20 of 21

recitation of evidence offers nothing to rebut his testimony." Pl.'s Br. [DE-8] at 16–17. However, it is evident from the ALJ's decision that she did consider Claimant's testimony regarding his physical impairments and her RFC assessments related to these impairments are supported by substantial evidence. Thus, it is not the province of the court to reweigh that evidence. *See Hancock*, 667 F.3d at 472.

## VI. CONCLUSION

For the reasons stated above, the final decision of the Commissioner is affirmed.

So ordered, the ___18___ day of August 2025.

Robert B. Jones, Jr.
United States Magistrate Judge

21